**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Oct 29 2013, 5:32 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**ANTHONY C. LAWRENCE**
Anderson, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ERIC P. BABBS**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| P.A., | ) |
| | ) |
| Appellant-Defendant, | ) |
| | ) |
| vs. | )  No. 33A01-1305-JV-196 |
| | ) |
| STATE OF INDIANA, | ) |
| | ) |
| Appellee-Plaintiff. | ) |

APPEAL FROM THE HENRY CIRCUIT COURT
The Honorable Mary G. Willis, Judge
Cause No. 33C01-1302-JD-10

**October 29, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**ROBB, Chief Judge**

Case Summary and Issue

P.A. was adjudicated a delinquent child after he admitted to committing what would have been resisting law enforcement, a Class A misdemeanor, if committed by an adult. The juvenile court awarded wardship of P.A. to the Indiana Department of Correction ("DOC") for housing in a correctional facility for children, with the recommendation that he receive mental health treatment and medication management. P.A. appeals the disposition, raising one issue for our review: whether the trial court abused its discretion in committing him to the DOC. Concluding P.A.'s history of involvement with the juvenile justice system warranted such a disposition, we affirm.

Facts and Procedural History

P.A.'s mother called New Castle Police Department officers to her home because her seventeen-year-old son, P.A., was "out of control." Appellant's Appendix at 11. P.A. resided at the house with his parents, his girlfriend, and their one-month-old child. P.A.'s mother reported to the officers that P.A. had been yelling at everyone for a long time and had broken several pieces of furniture. She also reported that P.A. refused to take prescribed psychiatric medication. The officers observed P.A. "charging" his mother and yelling obscenities at her. Id. When the officers attempted to restrain him, he struggled and directed obscenities at them despite their warnings for him to calm down. The officers placed P.A. in handcuffs, advised him he was under arrest for resisting, and transported him to the New Castle Police Department.

The State filed a delinquency petition alleging P.A. had committed acts that would constitute resisting law enforcement, a Class A misdemeanor, and criminal mischief, a Class B misdemeanor, if committed by an adult, and also alleging that he "habitually

2

disobeys the reasonable and lawful commands" of his parents and needs care, treatment, or rehabilitation requiring the coercive intervention of the court. Id. at 30. P.A. admitted to the delinquent act of resisting law enforcement, the trial court adjudicated him a delinquent, and the State dismissed the remaining counts. The pre-dispositional report indicated that P.A. had been diagnosed with paranoia schizophrenia, panic disorder with agoraphobia, major depressive disorder, and generalized anxiety disorder. The report also indicated P.A. had nine referrals to the probation department since 2010, and that he had been offered least restrictive placements but had proven, by continuing to break the law and disobey his parents, that "a more restrictive level of care is needed for him." Id. at 53.

At the dispositional hearing, Henry County Juvenile Probation Officer Amy Bell, who had prepared the pre-dispositional report, acknowledged P.A.'s severe mental health issues, but testified that her recommendation was for P.A. to be committed to the DOC:

> Probation has been involved with [P.A.] since 2010, and we have had him on formal probation for two (2) separate times. He has been in and out of detention several different times. He's been in [a treatment facility], he has also been in Court order [sic] placement. We've also given him straight time as well. Probation has been exhausted and there are no other options for [P.A.] at this time. He could get more treatment if he is committed [to] the [DOC] that [sic] he would be serving straight time in a detention facility.
> * * *
> [I]f the Judge would want to release him it would have to be, you know, it would have to be that he is under strict supervision, because I don't believe the community or his family will be safe if he is released without strict supervision or continued therapy, um, and I guess anger management.

Transcript at 10-11. Phil Haggard, the probation-assigned therapist for this case who had also worked with P.A. during a previous case, testified that "it would require, uh, some pretty serious measures if he were to be released." Id. at 13. Haggard therefore agreed

3

with the probation department recommendation, presuming commitment to the DOC would give him the opportunity to receive psychiatric and medical treatment. P.A. and his father testified about their desire for him to be released to receive private therapeutic treatment.

At the conclusion of the testimony, the juvenile court made the following findings:

[P.A.] is suffering from a mental illness which has significantly impaired his ability to function. Despite the mental illness [P.A.] has adjudication [sic] for Resisting Law Enforcement and this present case 2013 has involved adjudication for Battery of a police officer; 2011 adjudication for Burglary; 2010 Theft, Runaway, Truancy, Resisting Law Enforcement, Incorrigibility, Possession of Paraphernalia and then there was a Public Intoxication of a probation violation. There is quite a mental illness of Agoraphobia . . . . [P.A.'s] decisions to go out in the community endanger both himself and others. So, the Court does believe he needs treatment. The Court does think that the best place for that treatment is in a Juvenile Facility for boys that can't be accomplished in a straight secure placement. The Court has exhausted all sources of programs we have available for the Juvenile Justice System, which includes periods of probation supervision, in home counseling, out-patient counseling, medication management, two (2) prior residential placements – one court ordered and one voluntary. The Court is going to make a recommendation that he receive mental health treatment and immediate pharmacological medication management for his known mental health issues. . . . Court finds that the Wardship shall continue until such time as [DOC] determines rehabilitation. . . . Court is not going to reinstate any jurisdiction at the conclusion of this placement due to his age.[1]

Id. at 41-42. P.A. now appeals the disposition.

Discussion and Decision

I. Standard of Review

When a person under the age of eighteen commits an act that would be a crime if committed by an adult, the person is adjudicated a "delinquent child" and the juvenile court issues a dispositional decree providing for placement, sanctions, and treatment of

_____

[1] P.A. turned eighteen in August 2013.

4

the child. R.J.G. v. State, 902 N.E.2d 804, 806 (Ind. 2009). Dispositional decrees are intended to promote rehabilitation, id., consistent with the expressed legislative intent to "ensure that children within the juvenile justice system are treated as persons in need of care, protection, treatment, and rehabilitation," Ind. Code § 31-10-2-1(5). Thus, the juvenile court is given a myriad of alternatives and is accorded great latitude and flexibility to allow the disposition that "best fits the unique and varying circumstances of each child's problems." A.A.Q. v. State, 958 N.E.2d 808, 813-14 (Ind. Ct. App. 2011).

The choice of the specific disposition of a juvenile adjudicated a delinquent child is a matter within the sound discretion of the juvenile court, subject to certain statutory considerations. D.A. v. State, 967 N.E.2d 59, 64 (Ind. Ct. App. 2012). Indiana Code section 31-37-18-6 provides that the juvenile court shall choose a disposition that is "in the least restrictive . . . and most appropriate setting available," consistent with the safety of the community and the best interest of the child. We will reverse only if there has been an abuse of discretion, which occurs when the juvenile court's action is clearly erroneous and against the logic and effect of the facts and circumstances before the court or the reasonable, probable, and actual inferences that can be drawn therefrom. D.A., 967 N.E.2d at 64.

## II. DOC Wardship

P.A. argues the juvenile court abused its discretion in awarding wardship of him to the DOC because the court "failed to consider the special circumstances of P.A.," including his mental health condition and his particular family circumstances. Appellant's Brief at 8. We disagree. The juvenile court made the findings required by statute, see Ind. Code § 31-37-18-9(a), and referenced the "special circumstances" P.A.

5

contends were not considered. The juvenile court recognized P.A.'s mental health issues and specifically determined that those issues and his inability to appropriately deal with them required treatment and medication management best provided in a DOC facility. Although the juvenile court did not specifically mention the fact that P.A. had an infant child, treatment of his mental health issues would only be beneficial to his relationship with his child and improve his ability to care and provide for him, especially considering the child was present when P.A. was so out of control that his parents called the police for assistance.

P.A. also analogizes the facts of his case to those in D.P. v. State, 783 N.E.2d 767 (Ind. Ct. App. 2003). The juvenile in D.P. had just one prior contact with the juvenile justice system when he was ten years old, and he had successfully completed probation and stayed out of trouble for five years after that. The conduct which invoked the juvenile justice system on this occasion was not repetitive or serious, and there was little evidence to suggest that he would not respond positively to probation. Therefore, this court held that a commitment to the DOC was not warranted and a less-harsh disposition should have been ordered. Id. at 771. Even P.A. admits that he has a history of prior juvenile adjudications and that he has been afforded multiple different opportunities to rehabilitate, none of which have been successful. See Appellant's Brief at 9. Therefore, P.A.'s situation is substantially different from the juvenile's situation in D.P., and the result in D.P. does not drive our decision here. Cf. E.H. v. State, 764 N.E.2d 681, 685-86 (Ind. Ct. App. 2002) (reversing dispositional decree awarding wardship to the DOC because the juvenile's involvement with the juvenile justice system was, in part, due to

his parents' abuse and neglect, there was no evidence he was a threat to the community, and he had been making considerable progress in his current situation), trans. denied.

Indiana Code section 31-37-18-6 states that a juvenile should be placed in the least restrictive placement "[i]f consistent with the safety of the community and the best interest of the child," inherently recognizing that the least restrictive placement is not always the appropriate placement. See C.C. v. State, 831 N.E.2d 215, 219 (Ind. Ct. App. 2008). P.A.'s history, the testimony at the dispositional hearing, and the juvenile court's findings in this case indicate this is such a situation. The juvenile court did not abuse its discretion in entering a dispositional decree awarding wardship of P.A. to the DOC.

## Conclusion

Given P.A.'s lengthy history of delinquency adjudications and the repeated failure of less restrictive placements to alter his behavior, we hold the juvenile court's dispositional decree was not an abuse of discretion.

Affirmed.

RILEY, J., and KIRSCH, J., concur.